**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MEREDITH O'NEIL, JESSICA SVEDINE, DEANNA CORBY, and ROBERTO SILVA, <br><br> Plaintiffs, <br><br> v. <br><br> CANTON POLICE DEPARTMENT, the TOWN OF CANTON, MASSACHUSETTS, HELENA RAFFERTY, as Chief of the Canton Police Department and in her personal capacity, and OFFICER ROBERT ZEPF, OFFICER MICHAEL CHIN, OFFICER ANTHONY PASCARELLI, and SERGEANT JOSEPH SILVASY, in their official and individual capacities, <br><br> Defendants. | Civil Action No. 1:23-cv-12685-DJC <br><br><br> **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FED. R. CIV. P. 12(c)** |

Defendants avoided a preliminary injunction by cleverly not informing the Court that they were already in the process of filing criminal charges against Plaintiffs.[1]  But, they remain liable for infringing Plaintiffs' rights and cannot avoid the consequences through a motion for judgment on the pleadings (ECF Nos. 40-41).  Defendants' motion for judgment must be denied.

**1.0     Factual Background**

Plaintiffs Meredith O'Neil, Jessica Svedine, Deanna Corby, and Roberto Silva are Massachusetts residents who believe that Karen Read is being framed.  Verified Complaint (ECF No. 1) at ¶ 1.  They have protested peacefully and wish to continue to do so.  *Id.*

//

//

//

//

---

[1] Plaintiffs are not suggesting counsel for Defendants was then-aware.

## 1.1    The Prosecution of Karen Read

By way of background, John O'Keefe was a member of the Boston Police Department who, at the time of his death, lived in Canton, Massachusetts.  *Id.* at ¶ 10.[2] Karen Read was romantically involved with O'Keefe prior to his death. *Id.* at ¶ 11. On Friday, January 28, 2022, O'Keefe and Read were at the Waterfall Bar & Grille, in Canton, Massachusetts, and had drinks there with Chris Albert (a Town of Canton Selectman), Brian Albert (a Boston police officer and Chris Albert's brother), and Jennifer McCabe (Brian Albert's sister-in-law).  *Id.* at ¶ 12.  When the bar was closing, Brian Albert invited O'Keefe, Read, and his relations back to his house, and O'Keefe and Read drove to Brian Albert's house.  *Id.* at ¶ 13.  The following morning, on January 29, 2022, Read, McCabe, and O'Keefe's friend, Kerry Roberts, found O'Keefe in the snow outside Brian Albert's house. *Id.* at ¶ 14.  O'Keefe was pronounced dead by physicians at Good Samaritan Medical Center in Brockton, Massachusetts, later that morning.  *Id.* at ¶ 15.  Read was, thereafter, charged with manslaughter, having allegedly hit O'Keefe with her automobile.  *Id.* at ¶ 16.

Subsequent to her arrest, Read's lawyer was given a tip that Brian Albert and his nephew, Colin Albert (who had an acrimonious relationship with O'Keefe), had beaten up O'Keefe that night, to the point of unconsciousness, and that Brian Albert and Brian Higgins (a special agent with the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives), who had been at Brian Albert's house, dumped O'Keefe's body on Brian Albert's lawn.  *Id.* at ¶ 17.  Read thereafter learned that State Trooper Michael Proctor, a Canton resident and lead detective into the investigation of O'Keefe's death, was apparently a friend to the Albert family—Colin Albert, for

---

[2] The background on the O'Keefe death and Read prosecution are provided for context purposes relative to Plaintiffs' protests and, as noted in the Verified Complaint, are drawn from the September 27, 2023, article in Boston Magazine by Gretchen Voss, entitled "The Karen Read Case in Canton:  The Killing that Tore a Town Apart" (ECF No. 1 at ¶ 9, citing ECF No. 1-1).  Plaintiffs do not have personal knowledge as to these events.

example, had been the ring bearer at Proctor's sister's wedding.  *Id.* at ¶ 18.  As a result, Read believed that, to protect the Alberts, Proctor framed Read for O'Keefe's death.  *Id.* at ¶ 19. However, Proctor, on June 9, 2022, arrested Read again, following a grand jury indictment against Read for second-degree murder.[3]  *Id.* at ¶ 20.  On April 12, 2023, Read's defense team filed a 92-page affidavit in her case outlining their theory of how Read had been framed.  *Id.* at ¶ 21.

### 1.2    Public Attention and Government Crackdown

On April 18, 2023, journalist Aidan Kearney, published his first article about the alleged framing of Read.[4]  *Id.* at ¶ 22. Kearney's reporting brought public support to Read, and public demonstrations in support of her followed. *Id.* at ¶ 23.  There is widespread public interest in the prosecution of Read—*Dateline* has been filing Read for a show and Netflix and others have approached Kearney relative to a documentary.  *Id.* at ¶ 24.

At an August 8, 2023, meeting of the Canton Select Board, residents voiced their concerns about Selectman Chris Albert and the Canton Police Department *vis a vis* the O'Keefe death.  *Id.* at ¶ 25.  During that Meeting, Defendant Helena Rafferty, Chief of the Canton Police Department,[5] referred to an event:

> "that made residents of our community feel disrespected, targeted, and intimidated, an event that I believe, under statute 268 13A could most possibly be deemed a criminal act. Additionally, we have an elected library trustee who, as of noon today, was still listed as a co-administrator on a social site that is allowing residents of our community to also be disrespected and dehumanized within innuendos, outright falsehoods, half-

---

[3] The prosecution is pending in the Norfolk County Superior Court, styled *Commonwealth v. Karen Read,* Docket No. 2282CR0117.

[4]    https://tbdailynews.com/corrupt-state-trooper-helps-boston-cop-coverup-murder-of-fellow-officer-frame-innocent-girlfriend/

[5] Defendant Canton Police Department ("CPD") is a police department established pursuant to Mass. Gen. Laws, ch. 41, § 97, is located in Canton, Massachusetts, and is a political subdivision of the Defendant Town of Canton, Massachusetts.  ECF No. 1 at ¶ 2.  To the extent CPD is not capable of being sued, the Town of Canton is named as a Defendant, and they should be treated as a single entity.

truths, and bullying comments, comments, I might add, that if it were made in a school environment, would and should have every resident in this town in an uproar.  Yesterday, I received an email from a concerned citizen related to the, and I quote, 'horrendous, threatening posts' on this site, asking me to address the issue, as she is worried about how it might-may incite people to act moving forward.  Let me make one thing as crystal clear as possible to-as I continue with my comments to the residents:  I embrace the fact that we live in a country where people can have different viewpoints.  I respect everyone's right to voice those viewpoints under the First Amendment.  I can appreciate that some people have questions on the O'Keefe case, based on the limited information they have seen thus far.  However, what I cannot accept is witnesses, let me repeat that, witnesses— these are residents who have not been charged with any crimes—being bullied in their homes, at their children's games, or on vacation, all under the guise of the First Amendment.  This is a really slippery slope that, if allowed to continue, will cause a rapid decline in the amount of people who would ever step forward to be a witness in a case and, quite possibly, the slow erosion of the criminal justice system."[6]

*Id.* at ¶ 26.  Two months later, on October 11, 2023, Kearney was charged with six counts of intimidation under Mass. Gen. Laws, ch. 268, § 13B, and one count of conspiracy to do so.  *See Commonwealth v. Aiden Kearney*, Docket Nos. 2355CR001150, 2355CR001151, 2355CR001152, 2355CR001154, 2355CR001155, 2355CR001156, and 2355CR001157, in the Stoughton District Court.

### 1.3    Plaintiffs Engage in a Demonstration

To protest against injustice, Plaintiffs and other members of the public gathered on Sunday, November 5, 2023, at the busiest intersection in Canton, across the street from C.F. McCarthy's pub (where Read and O'Keefe were that fateful night), and which is adjacent to Chris Albert's business, D&E Pizza.  ECF No. 1. at ¶ 29.  At that protest, Plaintiffs held signs that had inoffensive slogans like "Free Karen Reed" and "Justice."  ECF No. 1 at ¶ 30.  Defendants Officers Robert Zepf, Michael Chin, and Anthony Pascarelli, and Sgt. Joseph Silvasy, members of the Canton

---

[6]    https://cantonmaselectboard.podbean.com/e/select-board-of-august-9-2023/,    beginning    at approximately 18:00.

Police Department, drove by the protest several times, attempting to intimidate the protesters into leaving. *Id.* at ¶ 31. These Defendants are supervised by Defendant Rafferty and necessarily act at her direction. *Id.* at ¶ 33. Such intimidation is consistent with Rafferty's August 8, 2023, policy that the Defendant Canton Police Department "cannot accept" those engaged in First Amendment-protected activities vis a vis witnesses in the Read prosecution. *Id.* at ¶ 32.[7]

When Defendants' intimidation tactic proved unsuccessful, Officers Robert Zepf, Michael Chin, and Anthony Pascarelli, and Sgt. Joseph Silvasy stopped and informed the protesters that they were not permitted to protest there, because if the protest could be seen by Chris Albert, they would deem it to be "witness intimidation" and Plaintiffs would be arrested. *Id.* at ¶ 34. The officers specifically handed Plaintiffs a copy of Mass. Gen. Laws, ch. 268, § 13A, they statute under which they threatened Plaintiffs. *Id.* at ¶ 35. At the time of filing, Defendants had an open investigation into Plaintiffs' November 5, 2023, protest, meaning they still faced potential unlawful arrest and prosecution. *See* ECF No. 1-2 (Email from Deputy Chief Patricia Sherrill to Jenna Rocco, Nov. 7, 2023).[8]

The threat of arrest and/or charges by Defendants for further protest was credible—Aiden Kearney has already been arrested and charged under the related witness intimidation statute, Mass. Gen. Laws, ch. 268, § 13B. *Id.* at ¶ 37. Defendants' threat of arrest placed Plaintiffs in fear for their safety and liberty. *Id.* at ¶ 38. As a result of Defendants' threat, Plaintiffs chilled their speech and determined to not move forward with a November 12, 2023, planned protest in support of Read and other similar such protests. *Id.* at ¶¶ 39-40.[9] Notwithstanding Plaintiffs' cessation,

---

[7] Defendants deny the allegations of paragraphs 29-33 in their unverified answer. (ECF No. 14).
[8] Defendants deny threatening Plaintiffs or telling them they could not protest at all in their unverified answer. (ECF No. 14).
[9] Defendants deny the allegations of paragraphs 38-40 in their unverified answer. (ECF No. 14).

Opposition to Defendants' Motion for Judgment on the Pleadings
1:23-cv-12685

following the denial of injunctive relief, Defendants made good on their threats and charged Plaintiffs with violation of the Massachusetts witness intimidation statutes. *See, e.g., Canton Police Dept. v. Corby*, Docket No. 2355AC001047 (Stoughton Dist. Ct.); *Canton Police Dept. v. O'Neil*, Docket No. 2355AC001043 (Stoughton Dist. Ct.).  These charges remain pending. *See id.*

### 2.0    Legal Standard

A Fed. R. Civ. P. 12(c) motion is "ordinarily accorded much the same treatment" as a 12(b)(6) motion. *See Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 54 (1st Cir. 2006). Thus, a plaintiff must have pleaded "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). As a motion for judgment on the pleadings "calls for an assessment of the merits of the case at an embryonic stage," the Court "view[s] the facts contained in the pleadings in the light most favorable to the nonmovant and draw[s] all reasonable inferences therefrom" in their favor. *Pérez-Acevedo v. Rivero-Cubano*, 520 F.3d 26, 29 (1st Cir. 2008) (citation omitted).  In addition, "[t]he court may supplement the facts contained in the pleadings by considering documents fairly incorporated therein and facts susceptible to judicial notice." *R.G. Fin. Corp. v. Vergara-Nuñez*, 446 F.3d 178, 182 (1st Cir. 2006).   Although Defendants deny some of Plaintiffs' allegations, "Rule 12(c) does not allow for any resolution of contested facts; rather, a court may enter judgment on the pleadings only if the uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment." *Aponte-Torres*, 445 F.3d at 54.

### 3.0    Argument

Plaintiffs bring two counts in their Verified Complaint:  1) for retaliation under 42 U.S.C. § 1983, on account of the direct threat to prosecute Plaintiffs under Section 13A, thereby chilling their speech; and 2) for declaratory and injunctive relief under 42 U.S.C. § 1983 and the First

Amendment that Sections 13A and 13B are facially unconstitutional, void for vagueness, and unconstitutional as applied.  Defendants are not entitled to judgment on either count.

### 3.1     The Statutes are Unconstitutional

To begin, it is necessary to examine the text of the statutes under which Defendants first threatened to apply to Plaintiffs and then actually did apply to Appellants through levying criminal charges. G.L. c. 268, § 13A ("Section 13A") states, in relevant part:

> Whoever, with the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any … witness…, in the discharge of his duty, pickets or parades … in or near a building or residence occupied or used by such …witness, … shall be punished by a fine of not more than five thousand dollars or by imprisonment for not more than one year, or both.

Similarly, G.L. c. 268, § 13B(b) ("Section 13B") states, in relevant part:

> Whoever willfully, either directly or indirectly: …(iii) misleads, intimidates or harasses another person who is a: (A) witness or potential witness … with the intent to or with reckless disregard for the fact that it may; (1) impede, obstruct, delay, prevent or otherwise interfere with: … a trial or other criminal proceeding of any type … shall be punished by imprisonment in the state prison for not more than 10 years or by imprisonment in the house of correction for not more than 2 1/2 years or by a fine of not less than $1,000 or more than $5,000 or by both such fine and imprisonment. If the proceeding in which the misconduct is directed at is the investigation or prosecution of a crime punishable by life imprisonment or the parole of a person convicted of a crime punishable by life imprisonment, such person shall be punished by imprisonment in the state prison for not more than 20 years or by imprisonment in the house of corrections for not more than 2 1/2 years or by a fine of not more than $10,000 or by both such fine and imprisonment.

The statutes fail to meet constitutional scrutiny and fail to survive constitutional challenge.

In the First Amendment context, a restriction on speech is deemed facially unconstitutional if it "punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep.'" *U.S. v. Ackell*, 907 F.3d 67, 72 (2018) (quoting *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003)). In contrast, an as-applied challenge "requires an analysis of the facts of

a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right." *O'Neil v. Canton Police Dep't,* No. 23-cv-12685-DJC, 2023 U.S. Dist. LEXIS 202183, at *10 (D. Mass. Nov. 10, 2023) quoting *Picard v. Magliano*, 42 F.4th 89, 101 (2d Cir. 2022).

Defendants agree that G.L. c. 268, §§ 13A and 13B are content-based restrictions on speech, subject to strict scrutiny.  (ECF No. 41 at 5-6).  "[A] speech regulation is content based if the law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 171. This Circuit recognizes that, as a general rule, "the government cannot inhibit, suppress, or impose differential content-based burdens on speech." *McGuire*, 260 F.3d at 42. Such laws are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163, citing *R. A. V. v. St. Paul*, 505 U. S. 377, 395 (1992); *Simon & Schuster, Inc. v. Members of N. Y. State Crime Victims Bd.*, 502 U.S. 105, 115, 118 (1991).

Likewise, viewpoint discrimination occurs when there is a "governmental intent to intervene in a way that prefers one particular viewpoint in speech over other perspectives on the same topic." *Ridley v. M.B.T.A.*, 390 F.3d 65, 82 (1st Cir. 2004). Dictating how a speaker may present a criticism is viewpoint discrimination. *Morse v. Frederick*, 551 U.S. 393, 436 (2007) ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction"), quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828-29 (1995)); *Clark*, 468 U.S. at 293 (a restriction is content neutral if it is "justified without reference to the content of the regulated speech"). Such statutes are presumed to be unconstitutional "[t]o provide maximum assurance that the government will not throw its weight on the scales of free expression, thereby 'manipulating

Opposition to Defendants' Motion for Judgment on the Pleadings
1:23-cv-12685

… public debate through coercion rather than persuasion.'" *McGuire*, 260 F.3d at 43. As the District Court previously recognized, both Section 13A and Section 13B are content-based restrictions, and the government must meet strict scrutiny, meaning that the application must be "narrowly tailored to serve a significant governmental interest, and … 'leave open ample alternative channels for communication of the information.'" *Ward*, 491 U.S. at 791, quoting *Clark*, 468 U.S. at 293.

### 3.1.1    The Statutes are Unconstitutional both Facially and As-Applied

The statutes fail facial and as-applied challenges.  Here, Section 13A and Section 13B discriminate based upon content and viewpoint because they are being used specifically against speech which conveys a particular message from a particular viewpoint, *i.e.*, "the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any … witness…," G.L. c. 268, § 13A, and with the "with the intent to … impede, obstruct, delay, prevent or otherwise interfere with: … a trial or other criminal proceeding of any type," G.L. c. 268, § 13B. Put more succinctly, both statutes criminalize words which carry the intent of the speaker to purportedly influence a witness or interfere with a criminal proceeding. They do not criminalize the particular conduct, *e.g.*, picketing within the proximity of a witness or speaking with a witness, they instead criminalize the particular intent behind the conduct. The courts of Massachusetts recognize this, at least as to Section 13B. *See Comm. v. Frazier*, 99 Mass. App. Ct. 1120, 167 N.E.3d 909 (2021) (applying strict scrutiny analysis to Section 13B).

Defendants assert that the statutes "serve the compelling interest of protecting the administration of justice."  (ECF No. 41 at 6).  The government has no compelling interest in a demonstrator encouraging a witness to testify truthfully, much less in a demonstrator merely holding up a sign that says "JUSTICE."  Plaintiffs do not dispute that protecting the administration

Opposition to Defendants' Motion for Judgment on the Pleadings
1:23-cv-12685

of justice is an interest, but question whether it is sufficiently compelling.  Both the state and federal governments consist of three "co-equal" branches.  *Clinton v. Jones*, 520 U.S. 681, 699 (1997).  Citizens routinely protest outside the White House and the Governor's residence, in full view of witnesses and officials.  Citizens routinely protest outside the Capitol and the General Court, in full view of witnesses and officials.  The judiciary is not special and Defendants offer no reason why it deserves special treatment.  The administration of justice is no more important than the administration of the executive or legislative functions.  Yet, if Sections 13A and 13B are constitutional, then the government could (and given current trends, it inevitably will) justify prohibiting all forms of demonstrative activity as to all government activity and employees, anywhere such demonstrations might be heard.  Moreover, even if the judiciary were not co-equal, "protecting the orderly administration of justice" could be used for all manner of mischief, for example, to extrajudicially enjoin the media from reporting on court proceedings. "Protecting the orderly administration of justice" could mean you cannot lobby a legislator to vote against a judicial nominee or to expand the number of seats on a court. It is not a well-defined or compelling interest in and of itself.  There may be an interest to protect, but the sloppy drafting of these laws, in the hands of statists with no compulsion toward restraint, should be looked at with fear, and not acquiescence, by anyone seeking to be protective of our Constitution.

The statutes are not narrowly tailored—to the contrary, they are far broader than necessary. While the Supreme Court upheld a similar statute relating to picketing or parading near courthouses, it has not approved of such a statute *vis a vis* **any building at all** in which a witness **may** be found.  *Contrast Cox v. Louisiana*, 379 U.S. 559 (1965).  This is especially where Plaintiffs have and will restrict themselves from engaging in the "blocking, impeding, inhibiting, or in any other manner obstructing or interfering with access to, ingress into and egress from any building

Opposition to Defendants' Motion for Judgment on the Pleadings
1:23-cv-12685

or parking lot of the" business they plan to protest. *Compare Madsen v. Women's Health Ctr.*, 512 U.S. 753 (1994) (upholding such restrictions on protest activities near abortion clinics). "Singing ... whistling, shouting, [and] yelling" are forms of speech protected by the First Amendment. *Id.* at 772. Listening to citizens seeking redress of grievances is part of a public official's (such as Selectman Albert) job. But here, a member of the legislative branch of a local government feels annoyed at citizens holding up a sign that says JUSTICE across the street from a business he owns – so he abuses his authority, enlisting men with guns and badges to shut it all down on some vague suggestion that a witness *might* be found across the intersection, and this witness *might* claim to feel a certain way.

If the statutes were narrowly tailored, they could instead more specifically criminalize attempting to dissuade a witness from participating in the judicial process or explicitly attempting to procure knowingly perjurious testimony. Instead, the statute widely captures all such speech which might be directed at a witness for any purpose whatsoever, necessarily including attempts to encourage a witness to tell the truth. Since there can be no compelling government interest in suborning perjury, and since the statute includes such speech aimed to avoid such a situation, the statue is not narrowly tailored.

Further, the limitless geographical scope of the statutes here means the statutes are not narrowly tailored. Plaintiffs-Appellants were across a busy intersection. In reaching its conclusion that the statutes met strict scrutiny, the District Court relied heavily on *Cox v. Louisiana*, which held that a Louisiana statute criminalizing picketing or parading near a courthouse with the intent to influence a judge, juror, witness, or court officer, met the compelling interest of "protecting its judicial system from the pressures which picketing near a courthouse might create." 379 U.S. 559, 560, 562 (1965). In Massachusetts, however, we are now to take *Cox*'s protection of *the*

Opposition to Defendants' Motion for Judgment on the Pleadings
1:23-cv-12685

*courthouse* and just expand it to everywhere and anywhere?  Louisiana was using its statute to put a damper on the Civil Rights movement, but even Jim Crow's cousin was not as brazen nor as shameless as Defendants are here.

The compelling interest identified by Defendants does not match any interest actually served by Sections 13A and 13B. The statute in *Cox* identified a specific geographic restriction— the area surrounding a courthouse. Judges, witnesses, jurors, and court officers cannot avoid a protestor who is demonstrating on the court steps. The statutes at issue here instead criminalize protesting anywhere that a witness might be present—including if they happen to own a pizza shop on the busiest corner of town, next to a bar the victim and accused visited the fateful night.  If they were in a house across the street or if Albert were going house to house to knock on doors to campaign for reelection, Defendants would still criminalize speech within that house.

Section 13A is unconstitutional as applied.  Defendants have been purposely targeting people, like Plaintiffs, who speak in favor of Karen Read, and there is nothing that suggests they would threaten anyone siding with the prosecution.  Section 13B is unconstitutional, as applied to Plaintiffs, as they would be singled out because of the viewpoint and content of their speech.  Had they protested against Karen Read, rather than in her favor, they would have no fear of arrest or prosecution under Section 13B.  Further, Defendants have applied these laws in a novel way – claiming that if a witness can even *see* a protest, then the protest is unlawful.[10]  It is convenient that anyone can simply create a roaming zone of no-free-speech, but it is also Constitutionally repugnant.

---

[10] The Court, for example, is well-aware of protests visible from its own courthouse, such as the ones accompanying the Tsarnaev trial, that took place without interruption or threats under G.L. c. 268, §§ 13A or 13B.

Plaintiffs have not done anything that would arise to "serious evil" that justifies the restrictions imposed by Defendants. *See United States v. Treasury Employees*, 513 U.S. 454, 475 (1995). It is incumbent on Defendants to justify their conduct, not for presumptively free citizens to turn over every object, to find a confession written under it. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."). Defendants have no reasonable justification for their actions, which not only speak, but shout, for themselves. Defendants, like Plaintiffs, should be interested in seeing justice done and not suborning perjury. Defendants' content and viewpoint discriminatory conduct is unconstitutional.

The fact that the speech at issue here—speech which the statutes purport to criminalize— took place within a traditional public forum, entitles Plaintiffs to heightened protections. A traditional public forum is property "which by long tradition or by government fiat ha[s] been devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Such "quintessential public forums," include "parks, streets, and sidewalks." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 817 (1985). These First Amendment protections extend to protests and demonstrations which may take place on city streets and in public parks. *See Shuttlesworth v. Birmingham*, 394 U.S. 147, 153 (1969). The government may impose "reasonable restrictions on the time, place, or manner of protected speech;" however, any such restrictions must be "'justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) quoting *Clark*, 468 U.S. at 293 (1984). Although the freedom of speech may be regulated by reasonable time place and manner restrictions, "peaceful demonstrations in

public places are protected by the First Amendment." *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972); *Snyder v. Phelps*, 562 U.S. 443, 456 (2011).   "When a restriction on speech in a traditional public forum targets the content of speech, that restriction raises the special concern 'that the government is using its power to tilt public debate in a direction of its choosing.'" *March v. Mills*, 867 F.3d 46, 54 (1st Cir. 2017), quoting *Cutting v. City of Portland*, 802 F.3d 79, 84 (1st Cir. 2015).

A content-based restriction on speech within a traditional public forum "may be upheld only if that law uses ***the least speech restrictive means*** to serve what must be a compelling governmental interest." *Id.* (emphasis added), citing *Globe Newspaper Co. v. Beacon Hill Architectural Comm'n*, 100 F.3d 175, 182 (1st Cir. 1996).   Restrictions to speech within a traditional public forum must be "justified without reference to the content of the regulated speech," be "narrowly tailored to serve a significant governmental interest," and "leave open ample alternative channels for communication." *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984). Even if the statutes were narrowly tailored, the statutes are content based and are not narrowly tailored to such a degree as to avoid criminalizing speech on matters of public interest (a murder case attracting national attention), made in a traditional public forum (on a city sidewalk), and for a charitable reason (encouraging justice).   Nor are there ample alternative channels.   Demonstrations outside the roving zone of wherever a witness may be or on the internet are no substitution for in-person, on-site demonstrations.   *See, e.g., City of Ladue v. Gilleo*, 512 U.S. 43, 56-57 (1994) (location of speech carries its own message and alternative channels may not carry that message).   The sidewalks and streets outside the courthouse or the location of the bar are where the reporters report from, and it is where government officials would take notice. "People assemble in public places not only to speak or to take action, but also to listen, observe,

Opposition to Defendants' Motion for Judgment on the Pleadings
1:23-cv-12685

and learn; indeed, they may "[assemble] for any lawful purpose," *Hague v. CIO*, 307 U.S. 496, 519 (1939) (opinion of Stone, J.).  It is where the public is paying attention.  No one would say that such alternatives were sufficient for anti-abortion protestors or for protests outside the Israeli Embassy/Palestinian Mission, and the *Read* prosecution should not be singled out for special treatment under the constitution.  Thus, the Court should find the statutes facially unconstitutional, or at least unconstitutional as-applied.

### 3.1.2   The Statutes are Unconstitutionally Vague

A law is unconstitutionally vague where "it does not provide fair notice of what conduct it prohibits and creates a risk of arbitrary enforcement." *Doe v. Hopkinton Pub. Schs*, 19 F.4th 493, 509 (1st Cir. 2021). It must give "a person of ordinary intelligence fair notice of what is prohibited" and must not be "so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. 285, 304 (2008). A law allows an impermissible amount of enforcement discretion "where it fails to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent arbitrary and discriminatory enforcement." *Frese v. Formella*, 53 F.4th 1, 7 (1st Cir. 2022).   In cases involving laws that restrict speech, courts use a heightened standard that requires greater specificity in such laws. *Id*. at 6.  Plaintiffs cannot ascertain what is and is not lawful under the statutes.  A sign that says "JUSTICE" is deemed by Defendants to be disallowed, even though such is not likely to intimidate a witness.  The statutes are so unclear that it is impossible for a person of ordinary intelligence to know whether signs saying "XYZ Pizza Shop Doesn't Sell Pineapple Pizza" or "Vote Against Chris Albert" are prohibited.  These laws permit the Police to decide which ideas they favor in the marketplace of ideas, and to shut down those they disfavor, with no reasonable discretion nor any restraint.

### 3.2 Defendants are Liable for Retaliation

Defendants' conduct in threatening Plaintiffs with arrest and/or prosecution (and actually doing so) as a result of their speech was retaliatory. To succeed on a First Amendment retaliation claim, a plaintiff must show that "(1) he or she engaged in constitutionally protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action." *D.B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012); *Najas Realty, LLC v. Seekonk Water Dist.*, 821 F.3d 134, 141 (1st Cir. 2016).

First, as discussed at length *supra*, Plaintiffs engaged in constitutionally protected speech. Plaintiffs protested on a city sidewalk, a traditional public forum, and displayed signs in support of speaking the truth about the framing of Karen Read. *See* ECF No. 1 at ¶¶ 29-30.

Second, Plaintiffs were subject to an adverse action. Defendants threatened to arrest and/or prosecute Plaintiffs if they continued their demonstrations, and in fact did charge them for their speech. *See id.,* at ¶¶ 34-35; *see also Canton Police Dept. v. Corby,* Docket No. 2355AC001047 (Stoughton Dist. Ct.); *Canton Police Dept. v. O'Neil,* Docket No. 2355AC001043 (Stoughton Dist. Ct.). Accordingly, Defendants' credible threat of arrest was itself the adverse action which chilled Plaintiffs' speech, and the actual prosecution even more so.

Third, Plaintiffs made sufficient allegations that connecting the adverse action to the protected conduct to demonstrate a likelihood of success on its retaliation claim. "Causation is established by showing that the plaintiff's conduct was a 'substantial' or 'motivating' factor in bringing about the allegedly retaliatory action." *Goldstein v. Galvin*, 719 F.3d 16, 30 (1st Cir. 2013), quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). A court may find that the protected conduct was a substantial or motivating factor in the adverse action unless the defendant shows that it would have made the same decision in the absence of the

protected conduct. *Powell v. Alexander*, 391 F.3d 1, 17 (1st Cir. 2004). Here, Plaintiffs' protected speech was indisputably the precipitating factor of Defendants' adverse action; because Defendants' threats to and prosecution of Plaintiffs stem solely from Plaintiffs' demonstrations, the causal connection is established.  Thus, the claim for retaliation was properly stated.

Defendants, individually, are not shielded from liability by qualified immunity.   Courts apply a two-prong analysis in determining qualified immunity.  *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009). These prongs are "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Id.*

As is often the case when analyzing a qualified-immunity defense, the primary question the court must answer is whether the asserted constitutional right is "clearly established." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). In recent years, the Supreme Court has relaxed the level of factual similarity necessary to clearly establish a constitutional right in cases where the government actor had ample time to consider their conduct. *Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (citing *Hope v. Pelzer*, 536 U.S. 730, 731 (2002)). In these cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity[.]" (cleaned up).

While the Supreme Court admonishes lower courts not to define a constitutional right too generally, *see Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011), it also advises that lower courts need not find case law with exactly the same facts to find a constitutional right is clearly established. *See Hope*, 536 U.S. at 731; *United States v. Lanier*, 520 U.S. 259.  The ultimate test for a clearly established law in a case *not* involving split-second decision making is whether a reasonable government actor had "fair warning" that their conduct was unlawful at the time. *See Hope*, 536 U.S. at 731.Defining a legal right at a higher level of generality still provides adequate notice to

all reasonable officers in such scenarios because the government actor has more time to consider their conduct – like in this case, where the government actors had plenty of time to look up a statute and print it out before threatening criminal sanctions.

Moreover, qualified immunity does not protect "obviously unconstitutional" actions by government officials. *See Lanier*, 520 U.S. at 271. In the First Amendment context where the government actor has ample time to consider their actions, general constitutional principles provide fair warning even in a novel factual scenario. *See Mountain Pure, LLC v. Roberts*, 814 F.3d 928, 932 (8th Cir. 2016). The plaintiff need not point to an analogous case with nearly identical facts to demonstrate that the law was clearly established. *Id.* The factual similarity required by the body of qualified-immunity case law is premised on protecting all but incompetent government actors. *Malley v. Briggs*, 475 U.S. 335, 342 (1986).  But, "incompetence" is relative and easier to define depending on the nature of government conduct at issue, taking into account how long the government had to consider their conduct. *al-Kidd*, 563 U.S. at 735. Because all government actors must behave reasonably in order to receive the protection of qualified immunity, the context in which the offending conduct occurred matters.

Plaintiffs' freedom to demonstrate was clearly established.  The Supreme Court has routinely upheld freedom from content-based restrictions against picketing on matters of public interest on public sidewalks.  *See, e.g., Madsen v. Women's Health Ctr.*, 512 U.S. 753 (1994) (enshrining the freedom to protest abortion clinics); *Boos v. Barry*, 485 U.S. 312 (1988) (enshrining the freedom to picket embassies); *Carey v. Brown*, 447 U.S. 455 (1980) (rejecting a prohibition on non-labor residential picketing).  There is even a right to protest outside the Supreme Court itself, thereby rejecting the notion that the judiciary requires special insulation.  *United States v. Grace*, 461 U.S. 171 (1983).  In fact, in synthesizing *Cox* with *Grace* and *Hodge v. Talkin*,

799 F.3d 1145 (D.C. Cir. 2015) (affirming restrictions on Supreme Court grounds), *cert. denied*, 136 S. Ct. 2009 (2016), it is apparent that governmental power, whether legislative, judicial, or executive, to restrict demonstrations *vis a vis* judicial proceedings extends only up to, but not including, the sidewalks, and extends no further, especially not into traditional public fora.  *See Verlo v. Martinez*, 262 F. Supp. 3d 1113, 1145-46 (D. Colo. 2017) (interpreting *Grace* and *Hodge*).  These freedoms are clearly established, notwithstanding Defendants' attempts to handwave them away merely because the statutes at issue were not yet declared unconstitutional.

Nor is this simply "reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).  Yet, qualified immunity is not granted when it is "sufficiently clear that every reasonable official would have understood that what he was doing violated the plaintiff's rights." *Ciarametaro v. City of Gloucester*, 87 F.4th 83, 88 (1st Cir. 2023) (cleaned up).  Any reasonable officer would know that demonstrating on the busiest corner of town, across from a site of interest for the victim and accused in a hot-button case is constitutionally protected.[11]  In fact, the evidence will show that the officers did not intervene until pressured by a politically-motivated prosecutor.

**4.0     Conclusion**

The Canton Police may or may not have framed Karen Read.  But, the First Amendment does not allow them, acting through Defendants, to shut down demonstrations on public sidewalks meant to bring awareness of injustice.  Sections 13A and 13B are unconstitutional on their face and are vague, but, even more so, they are unconstitutional as-applied to the facts here.  Defendants

---

[11] Plaintiffs recognize that this Court is bound by controlling precedent that qualified immunity even exists.  Plaintiffs reserve the right to challenge a doctrine that says government officials can freely violate the Constitution despite Section 1983 imposing such liability.  If a citizen can be imprisoned despite ignorance of the law, those charged with enforcing the law should not be held to a lesser standard of accountability.

engaged in retaliation on account of the content of Plaintiffs' speech, and they are not entitled to judgment as a matter of law.

WHEREFORE Plaintiffs respectfully request the motion for judgment on the pleadings be DENIED.

Dated: May 13, 2024.                    Respectfully Submitted,

                                        /s/ Marc J. Randazza
                                        Marc J. Randazza, BBO# 651477
                                        mjr@randazza.com, ecf@randazza.com
                                        Jay M. Wolman, BBO# 666053
                                        jmw@randazza.com
                                        Randazza Legal Group, PLLC
                                        30 Western Avenue
                                        Gloucester, MA 01930
                                        Tel: (978) 801-1776

                                        *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 13, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that a true and correct copy of the foregoing document is being served via transmission of Notices of Electronic Filing generated by CM/ECF.

<u>/s/ Marc J. Randazza</u>
Marc J. Randazza